IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Cr. No. 14-00721 JMS |
| | ) | |
| Plaintiff, | ) | ORDER DENYING (1) DEFENDANT |
| | ) | GABRIEL SABEDRA'S MOTION TO |
| vs. | ) | SUPPRESS, AND (2) DEFENDANT |
| | ) | ESTEBAN SABEDRA'S |
| GABRIEL SABEDRA, (01) | ) | SUBSTANTIVE JOINDER, DOC. |
| ESTEBAN SABREDA, (02) | ) | NOS. 44, 49 |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

## ORDER DENYING (1) DEFENDANT GABRIEL SABEDRA'S MOTION TO SUPPRESS, AND (2) DEFENDANT ESTEBAN SABEDRA'S SUBSTANTIVE JOINDER, DOC. NOS. 44, 49

## I. INTRODUCTION

On August 12, 2014, Defendants Gabriel Sabedra and his son co-Defendant Esteban Sabedra (collectively "Defendants" or the "Sabedras") were indicted for conspiracy to distribute, and possession with intent to distribute, methamphetamine in violation of 21 U.S.C. §§ 846, 841(a)(1), & 841(b)(1)(B). The charges resulted from a July 28, 2014 search pursuant to warrant of a residence (where the Sabedras were staying as "overnight guests") in Pearl City, Hawaii. Before the court is Gabriel Sabedra's Motion to Suppress, joined substantively by Esteban Sabedra, seeking to exclude all evidence obtained from

the search. The Sabedras contend that the warrant lacked probable cause, and that Drug Enforcement Agency ("DEA") Special Agent Patrick Wong ("Agent Wong") lacked a good faith basis for relying on the warrant. Based on the following, and after careful scrutiny of the record, the court DENIES Gabriel Sabedra's Motion to Suppress and Esteban Sabedra's Substantive Joinder. Doc. Nos. 44, 49.

## II. **BACKGROUND**

### A.    **Factual Background**

On July 28, 2014, U.S. Magistrate Judge Barry M. Kurren issued a search warrant authorizing federal law enforcement officers to search "[t]he property known as 1858 Waimano Home Road, Unit C, Pearl City, HI 96782, more specifically described as: a yellow two-story wooden structure with brown trim . . . situated on the west side of an access road leading to Waimano Home Road" ("the premises"). Gov't's Ex. 5 at 2. The warrant described the premises in more detail, and also authorized a search of "[a]ny vehicles located on the curtilage or premises of 1858 Waimano Home Road, Unit C, Pearl City, HI 96782." *Id.* The premises was the residence of unindicted co-conspirator Manuel Bernal ("Bernal").

The warrant sought documents and other items "relating to the distribution of controlled substances." *Id.* at 4. In particular, the warrant listed the following as "items authorized to be searched-for and seized:"

1.  Personal books and papers reflecting names, addresses, telephone numbers, and other contact/identification data relating to the distribution of controlled substances.

2.  Cash, currency, and records relating to income and expenditures of money and wealth from controlled substances. . . .

3.  Items of personal property which tend to identify the person(s) in residence, occupancy, control or ownership of the premises that is the subject of this warrant, including but not limited to cancelled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, statements, identification documents, and keys.

4.  Airline tickets, notes and itineraries, airline schedules, bills, charge card receipts, hotel/motel/rent-a-car statements correspondence with travel agencies . . . passports and other papers relating to domestic/international travel.

5.  Waybills, airbills, bills of lading, receipts, delivery notices, and other shipping documentation from the U.S. Postal Service, small package carriers, or common carriers which indicate the shipment of packages and parcels to and from Hawaii . . . .

6.  Firearms and ammunition.

7.  Cellular phones and pagers.

*Id.*

The Sabedras were at the premises when the warrant was executed on

July 28, 2014.[1]  The criminal Complaint in this action alleges that:

> During the search, investigators acquired approximately
> 204 gross grams of a crystal-like substance resembling
> methamphetamine in a safe.  This substance field tested
> positive for methamphetamine.  The safe also contained
> a small scale.  The safe was located in an upstairs master
> bedroom within a closet.  A U.S. Department of Defense
> vendor identification card in Gabriel SABEDRA's name
> was found in the same closet.  A larger scale was also
> found in the closet.  The bedroom also contained
> documents pertaining to Manuel BERNAL.  A passport
> in Gabriel SABEDRA's name was found in a bag, also in
> the same bedroom.

Doc. No. 1, Compl. at 4.  In the course of, or after, their arrest, the Sabedras gave

certain statements to law enforcement officials.  *Id.* at 5.  They now seek to

suppress the physical evidence taken during the search, as well as subsequent

statements made as a result of their arrest.

The search warrant was based on a July 28, 2014 Affidavit (the

"Affidavit") of Agent Wong.  Agent Wong's eighteen-page Affidavit describes the

---

[1]  The Sabedras proffered at the February 20, 2015 hearing, based on discovery and the criminal complaint, that they were "overnight guests" of Bernal, who resided at the premises. Doc. No. 44-1, Mot. at 1-2.  Given those proffers, the government agreed, and the court finds, that they have standing to challenge the search. *See, e.g.*, *United States v. Grandberry*, 730 F.3d 968, 974 (9th Cir. 2013) (reiterating that a defendant has standing to challenge a search "by virtue of his status as an overnight guest"); *Minnesota v. Olson*, 495 U.S. 91, 98-100 (1990) (recognizing that an overnight guest is one who is in the owner's home "with the permission of his host" and has a "legitimate expectation of privacy" sufficient to claim the protection of the Fourth Amendment).

basis for probable cause to believe that there were documents, records, property, and other evidence "relating to the distribution of controlled substances" at the premises.

The Affidavit begins by explaining Agent Wong's approximately fourteen years of employment with the DEA, and details his experience and knowledge in methodology utilized in narcotics trafficking. Gov't Ex. 4 at 2-9. Among other matters, the Affidavit establishes that methamphetamine is not presently manufactured to a significant extent in Hawaii, and that it is common for drug traffickers to have controlled substances manufactured in clandestine labs on the mainland or in the Far East, with drugs then sent to Hawaii via the U.S. Postal Service, private carriers, and/or through couriers. Cash payments or remuneration are then sent back to the sources through similar methods. The Affidavit explains that travel documents, records, telephone and address listings of clients and suppliers, and other types of evidence are typically found in traffickers' residences and vehicles. *Id.* ¶¶ 7-9.

The Affidavit bases probable cause on several different sources: (1) statements from two confidential informants involved in two previous methamphetamine arrests; (2) statements from other Defendants (Miguel Ruiz-Quintero ("Ruiz"), and Jesus Beltran ("Beltran")) involved in one of those two

cases; (3) pictures and phone numbers retrieved from a cellular phone obtained as a result of one of those arrests; (4) an anonymous "Crime Stoppers" tip sheet made via "Crime Stoppers Honolulu" that was forwarded by the U.S. Postal Inspection Service ("USPIS") to Agent Wong; (5) statements made by alleged co-conspirator Bernal; (6) other available information about Bernal (*e.g.*, his cell phone number, and his car registration); and (7) law enforcement surveillance of 1858 Waimano Home Road.

Specifically, the Affidavit describes two incidents in 2013 and 2014 of methamphetamine being sent to Hawaii addresses, hidden in "mannequin heads." First, on May 6, 2013, law enforcement officials in California obtained a search warrant for a suspicious United Parcel Service ("UPS") parcel addressed to 3814 Claudine Street in Honolulu. Three mannequin heads containing a total of six pounds of methamphetamine were found inside the parcel. Law enforcement in Hawaii, including the Hawaii Airport Task Force ("HATF"), conducted a controlled delivery of the parcel, and arrested several individuals, including "Cooperating Defendant 1" ("CD1"). *Id.* at 11-12, ¶¶ 12-13.

Second, on January 23, 2014, Agent Wong obtained a search warrant for a suspicious UPS parcel sent from California to an address in Kaaawa, Hawaii. The parcel included two mannequin heads containing a total of four pounds of

methamphetamine.  Law enforcement agencies conducted a controlled delivery of this parcel on January 24, 2014, and arrested three individuals:  Ruiz, Beltran, and "Cooperating Defendant 2" ("CD2").  *Id*. at 12-13, ¶¶ 14-15.  Beltran told investigators that Ruiz agreed to send methamphetamine to CD2.  *Id.* ¶ 15.  CD2 told investigators that CD2 knew the parcel contained methamphetamine and that CD2 was supposed to deliver it to Ruiz and Beltran.  *Id*.  The next day, Agent Wong retrieved a white Blackberry cell phone -- which Beltran later identified as Ruiz' cell phone -- from the ground near where the controlled delivery had taken place.[2]  The cell phone contained numerous pictures and other data, including:

- A picture of a parcel with a return address of "1858 Waimano Home Road, #C, Pearl City, HI  96782," addressed to a location in Arizona;

- Pictures of marijuana and methamphetamine;

- Pictures of Ruiz, including several "selfies" of Ruiz holding a white Blackberry cell phone, and pictures of Ruiz holding firearms.

- Numerous contacts with telephone number (408) 591-1389, stored under the name "Tijuana."

*Id*. ¶ 18.

------

[2]  Although Beltran said he sometimes *used* the cell phone, Beltran said it was not his and that it was Ruiz'.  Ruiz, however, told Agent Wong that it was not his cell phone.  Agent Wong then treated it as abandoned, and searched it.  Gov't Ex. No. 4 ¶ 17.

On May 30, 2014, Agent Wong received an anonymous "Crime

Stoppers" tip sheet forwarded to him by the USPIS.  According to the Affidavit,

> The tip said that "Manuel BARNALD" resides at "1836
> Waimano Home Road, apt. C, Pearl City, HI  96782" and
> he smuggles methamphetamine "hidden in dolls heads"
> from California through the mail.  The tipster also stated
> that some four to eight pounds are smuggled per month
> and that Manuel uses telephone number 408-591-1389.
> Additionally, the tip said that a gun, drugs and money are
> within a safe in a closet and that Manuel drives a white
> Chrysler 300 and went by the alias of "TJ" or "Mannie."

*Id.* ¶ 19.[3]

Motor vehicle databases established that "Manuel Bernal" (not

"Manuel Barnald") was the registered owner of a white Chrysler sedan with

license SBR 360 at 1858 Waimano Home Road, Unit C (not 1836 Waimano Home

Road, Unit C), Pearl City, Hawaii  96782.  *Id.* ¶ 20.  Agent Wong also later

---

[3] Both the government and Gabriel Sabedra submitted a copy of the actual tip sheet, and the parties agree that the tip was received by Crime Stoppers on April 11, 2014.  *See* Gov't Ex. 1; Doc. No. 44-5, Def.'s Ex. 3.  There is no indication, however, that the tip sheet was provided to Magistrate Judge Kurren when he issued the warrant -- the court thus focuses on the Affidavit's description of the tip sheet.  *See, e.g.*, *United States v. Bertrand*, 926 F.2d 838, 841 (9th Cir. 1991) ("In reviewing the validity of a search warrant, we are 'limited to the information and circumstances contained within the four corners of the underlying affidavit.'") (citations omitted).  Nevertheless, the court has confirmed that the Affidavit accurately sets forth the contents of the tip sheet, which contained many typographical errors such as "[h]e sumggels [sic] Meth in from California through the mail," drugs are sold from "reidence and vechile [sic]," "he keeps a notpad [sic] in his dresser draw [sic]," and "barnald tatoed accross upper back [sic]." Doc. No. 44-5, Def.'s Ex. 3 at 1.

determined that 1858 Waimano Home Road was separated from 1836 Waimano Home Road by one residence. *Id.* ¶ 23.

On July 2, 2014, Agent Wong and another agent interviewed CD1, who identified Ruiz and Beltran in a photo lineup, and stated that Ruiz was involved in drug trafficking (to avoid confusion, it was CD2 -- not CD1-- who was arrested with Ruiz and Beltran in the January 2014 Kaaawa drug arrest). *Id*. ¶ 21. CD1 did not recognize a photograph of 1836 Waimano Home Road, but *did* recognize 1858 Waimano Home Road -- CD1 said he had gone to 1858 Waimano Home Road with "Sanchez" (a co-defendant in the May 6, 2013 arrest at 3814 Claudine Street). *Id.* CD1 also knew that Sanchez went (although the Affidavit does not indicate when) to a unit at 1858 Waimano Home Road "to discuss illegal drug-related matters." *Id*. CD1 recognized Bernal in a photograph, identifying him as "an illegal alien." *Id.*

On July 10, 2014, Agent Wong and another agent interviewed CD2, who (like CD1) did not recognize 1836 Waimano Home Road in a photograph, but *did* recognize a photograph of sub-units at 1858 Waimano Home Road. CD2 recalled going (although the Affidavit does not indicate when) to 1858 Waimano Home Road with Ruiz and Beltran after a meeting in Pearl City where they gave CD2 methamphetamine. *Id.* ¶ 22.

On or about July 10, 2014, a USPIS officer advised or confirmed for Agent Wong that Bernal was receiving mail at 1858 Waimano Home Road, Apt. C, Pearl City, Hawaii 96782. *Id.* ¶ 23. (The USPIS had previously informed Agent Wong that Bernal was the addressee for a parcel addressed to 1858 Waimano Home Road in December 2013. *Id.*) Given the information from CD1, CD2, and other information linking Bernal to 1858 Waimano Home Road (*e.g.*, the car registration) -- and given that 1836 Waimano Home Road and 1858 Waimano Home Road are only separated by one house -- Agent Wong deduced that the reference to 1836 Waimano Home Road on the Crime Stoppers tipsheet was a meant to refer to 1858 Waimano Home Road. *Id.* The basis for this deduction was explained in the Affidavit to Magistrate Judge Kurren.

On July 19, 2014, Bernal was arrested on immigration charges at the Honolulu International Airport. *Id.* ¶ 24. Agent Wong learned that Bernal possessed a cell phone with the number (408) 591-1389 (the same number that was (1) stored in Ruiz' cell phone under the name "Tijuana," and (2) referenced as belonging to "Barnald" in the Crime Stoppers tip). *Id.* Bernal told authorities that his address was 1858 Waimano Home Road, Apt. C, Pearl City, Hawaii 96782. *Id.* Bernal told law enforcement after his arrest that "he obtained this car from his cousin." *Id.* Bernal was deported on July 23, 2014. *Id.* On July 24, 2014, HATF

investigators observed Bernal's white Chrysler 300 (license SBR360) outside of 1858 Waimano Home Road. *Id.*

## B.     Procedural Background

Agent Wong's Affidavit was presented to Magistrate Judge Kurren on July 28, 2014, and the search warrant was issued and executed that same day. Based on the results of the search, on July 29, 2014, a Criminal Complaint was filed against the Sabedras accusing them of conspiracy to possess, with intent to distribute, 50 grams or more of methamphetamine in violation of 21 U.S.C. §§ 841(a)(1) & 846.  Doc. No. 1.  On August 12, 2014, an Indictment was issued, charging the Sabedras in Count One as follows:

> Beginning at a date unknown to the grand jury, but not later than July 22, 2014, and continuing up to and including July 28, 2014 in the District of Hawaii and elsewhere, defendants GABRIEL SABEDRA and ESTEBAN SABEDRA, did knowingly and intentionally combine, conspire, confederate and agree with Manuel Bernal, each other, and with others known and unknown to the grand jury, to distribute and possess, with intent to distribute, fifty (50) grams or more, to wit: approximately 204 grams, of a mixture and substance containing a detectable amount of methamphetamine, its salts, isomers, and salts of isomers, a Schedule II controlled substance.
>           All in violation of Title 21 United States Code, Sections 846, 841(a)(1) & 841(b)(1)(B).

Doc. No. 20.

On December 22, 2014, Gabriel Sabedra filed his Motion to Suppress, Doc. No. 44, to which Esteban Sabedra filed a Motion for Joinder, adopting the arguments made in Gabriel Sabedra's Motion. Doc. No. 49. The government filed its Opposition on January 5, 2015. Doc. No. 52. A hearing was held on February 20, 2015. Doc. No. 20.

## III.  DISCUSSION

**A.    The Search Warrant Was Supported by Probable Cause**

### 1.    *Applicable Standards*

Under the Fourth Amendment of the United States Constitution, "no [w]arrants shall issue, but upon probable cause, supported by [o]ath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. "Probable cause exists when 'there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" *United States v. Grubbs*, 547 U.S. 90, 95 (2006) (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)). "In making this determination, a magistrate judge must assess the totality of the circumstances and make a 'practical, common-sense decision.'" *United States v. Chavez-Miranda*, 306 F.3d 973, 978 (9th Cir. 2002) (quoting *Gates*, 462 U.S. at 238).

> For probable cause to exist, a magistrate need not
> determine that the evidence sought is *in fact* on the
> premises to be searched, or that the evidence is more
> likely than not to be found where the search takes place.
> The magistrate need only conclude that it would be
> reasonable to seek the evidence in the place indicated in
> the affidavit.

*United States v. Fernandez*, 388 F.3d 1199, 1254 (9th Cir. 2004) (citation

omitted). That is, courts "have repeatedly held that an issuing magistrate may

draw reasonable inferences about where evidence is likely to be kept, based on the

nature of the evidence and the type of offense alleged." *Id.* at 1253 (citations

omitted). "To uphold the issuance of a warrant, [a court] 'need only find that the

issuing magistrate had a substantial basis for finding probable cause.'" *United

States v. Jennen*, 596 F.3d 594, 598 (9th Cir. 2010) (quoting *Chavez-Miranda*, 306

F.3d at 978).

"Under the totality of the circumstances test, otherwise innocent

behavior may be indicative of criminality when viewed in context. Additionally,

issuing judges may rely on the training and experience of affiant police officers."

*Chavez-Miranda*, 306 F.3d at 978 (citations omitted). For example, it is

reasonable for a judge to infer that "[i]n the case of drug dealers, evidence is likely

to be found where the dealers live." *Fernandez*, 388 F.3d at 1254 (quoting *United

States v. Angulo-Lopez*, 791 F.2d 1394, 1399 (9th Cir. 1986)).

13

"For anonymous tips to be given weight, 'officers must provide some basis to believe that the tip is true.'" *Jennen*, 596 F.3d at 598 (quoting *United States v. Clark*, 31 F.3d 831, 834 (9th Cir. 1994)). "[A]n anonymous tip *alone* seldom demonstrates the informant's basis of knowledge or veracity." *Navarette v. California*, 134 S. Ct. 1683, 1688 (2014) (quoting *Alabama v. White*, 496 U.S. 325, 329 (1990)) (emphasis in *Navarette*). "That is because 'ordinary citizens generally do not provide extensive recitations of the basis of their everyday observations,' and an anonymous tipster's veracity is 'by hypothesis largely unknown, and unknowable.'" *Id.* (quoting *White*, 496 U.S. at 329). "But under appropriate circumstances, an anonymous tip can demonstrate 'sufficient indicia of reliability to provide reasonable suspicion to make an investigatory stop.'" *Id.* (quoting *White*, 496 U.S. at 327) (square brackets omitted).

> For an anonymous tip to be the basis for probable cause, there must be additional evidence that shows the tip is reliable: "(1) the tip must include a range of details; (2) the tip cannot simply describe easily observed facts and conditions, but must predict the suspect's future movements; and (3) the future movements must be corroborated by independent police observation."

*Jennen*, 596 F.3d at 598 (quoting *United States v. Morales*, 252 F.3d 1070, 1076 (9th Cir. 2001)) (other citations omitted).

Stated differently, "[e]ven a tip from a completely anonymous informant -- though it will seldom demonstrate basis of knowledge and the veracity of an anonymous informant is largely unknowable -- can form the basis of reasonable suspicion or probable cause if it is sufficiently corroborated." *United States v. Elmore*, 482 F.3d 172, 179 (2d Cir. 2007) (internal citation omitted). "Stressing the importance of predictive information, [*Gates*] held that corroboration of some of the information in the tip allows the police to reasonably infer that the remaining, unverified information is also true." *Id*. at 180 (citing *Gates*, 462 U.S. at 243). And courts may essentially follow a "sliding scale" in assessing how much weight to assign a tip's reliability.

> Under the totality of the circumstances approach to assessing probable cause . . . informants do not all fall into neat categories of known or anonymous. Instead, it is useful to think of known reliability and corroboration as a sliding scale. Where the informant is known from past practice to be reliable . . . no corroboration will be required . . . [but] [w]here the informant is completely anonymous . . . a significant amount of corroboration will be required.

*Id.* at 181 (internal citations and emphasis omitted).

### 2.    *Application of Standards*

Although close, the court concludes that the Affidavit establishes probable cause. That is, the Affidavit describes facts that, although standing alone

do not justify issuance of a search warrant, in *combination* establish sufficient probable cause for the issuance of the search warrant.

In this regard, the court recognizes that the Crime Stoppers tip sheet provided to Agent Wong on May 30, 2014, *by itself*, would not have established probable cause to search the premises. *See, e.g.*, *Navarette*, 134 S. Ct. at 1688 (stating, in a reasonable suspicion context, that "an anonymous tip *alone* seldom demonstrates the informant's basis of knowledge or veracity"). But the Crime Stoppers tip sheet had at least some indicia of reliability (and, applying a sliding scale, is entitled to some, even if limited, weight) because Agent Wong or other law enforcement officers independently corroborated many of the tip's very specific details -- (1) a white Chrysler 300 was registered to Bernal at 1858 Waimano Home Road; (2) Bernal received mail and gave that as his address to immigration officials; (3) Bernal's cell phone number was (408) 591-1389 -- the same cell phone number that was linked to the January 24, 2014 arrest of Ruiz and CD2 involving methamphetamine hidden in mannequin heads, and which number was attributed to "Tijuana" (perhaps "TJ" as in the tip sheet); and (4) 1858 Waimano Home Road was identified by both CD1 and CD2 as related to drug activity. With this information, it was an obvious and certainly reasonable inference -- especially given that 1836 Waimano Home Road and 1858 Waimano

16

Home Road are separated by only one residence -- that (1) the tip sheet's reference to "1836 Waimano Home Road, apt. [sic] C" actually referred to 1858 Waimano Home Road, Unit C, and (2) "Manuel Barnald" referred to unindicted co-conspirator Manuel Bernal.

That is, the tip sheet "included a 'range of details' that were more than 'easily observed facts and conditions.'" *Jennen*, 596 F.3d at 598 (quoting *Morales*, 252 F.3d at 1076). These details were corroborated independently. It was thus reasonable for Agent Wong (and Magistrate Judge Kurren) to infer that other details of criminal activity in the tip were also likely to be true. *See, e.g.*, *Gates*, 462 U.S. at 244 ("'Because an [anonymous] informant is right about some things, he is more probably right about other facts,' . . . including the claim regarding the [defendants'] illegal activity. . . . [W]e think it suffices for the practical, common-sense judgment called for in making a probable cause determination.") (quoting *Spinelli v. United States*, 393 U.S. 410, 427 (1969) (White, J., concurring)). Specifically, it was reasonable to conclude that the tip's description of continuing illegal conduct (*i.e.*, that "[Bernal] smuggles methamphetamine 'hidden in dolls heads' from California through the mail . . . [and] some four to eight pounds are smuggled per month") may well also have been true. Gov't Ex. 4 ¶ 19.

Further, given the connection between 1858 Waimano Home Road and the previous drug arrests involving mannequin heads in May 2013 and January 2014, it was reasonable to conclude that the premises was integral to a continuing enterprise involving the same modus operandi (drugs smuggled in mannequin heads) -- the tip specifically referred to "Manuel Barnald" smuggling methamphetamine "hidden in dolls heads."  *See, e.g.*, *Travis v. United States*, 362 F.2d 477, 480 (9th Cir. 1966) (considering modus operandi of drug trafficker in assessing probable cause); *United States v. Daly*, 937 F. Supp. 401, 411 (E.D. Pa. 1996) (same); *United States v. Taylor*, 985 F.2d 3, 6 (1st Cir. 1993) ("[T]he issuing magistrate properly may credit the experience and pertinent expertise of a law enforcement affiant in evaluating the authenticity of the informant's description of the target's modus operandi."); *cf. United States v. Algie*, 721 F.2d 1039, 1044 (6th Cir. 1983) ("One factor pertinent to the magistrate's review of the 'totality of the circumstances' is the modus operandi of the individual suspected of criminal activity or of the unique criminal conduct allegedly involved.") (Krupansky, J., dissenting).

The Sabedras argue that the Affidavit was insufficient because it contains stale information -- the arrests involving CD1 and CD2 occurred over a year (with CD1) or six months (with CD2) before the July 2014 search warrant,

and the Crime Stoppers tip itself was two or three months old, with no specific information of future activity. They point out that other information purporting to corroborate the tip did not indicate *when* drug activity might have occurred in the past. They argue that, because Bernal had been deported five days before the warrant issued, there was little reason to believe he could be involved in future drug activity.

These arguments, however, are unconvincing, primarily because the search warrant was seeking documents, records, and physical evidence of drug activity -- it was not specifically seeking drugs themselves based, for example, on a tip that a particular parcel contained contraband. That is, it was a "documents warrant" seeking historical evidence, and not a "drugs warrant." The warrant here demonstrates that "[t]he mere lapse of substantial amounts of time is not controlling in a question of staleness." *United States v. Dozier*, 844 F.2d 701, 707 (9th Cir. 1988) (citation omitted). "The determination of probable cause is not merely an exercise in counting the days or even months between the fact relied on and the issuance of the warrant." *United States v. Williams*, 897 F.2d 1034, 1039 (10th Cir. 1990). *See, e.g.*, *Fernandez*, 388 F.3d at 1254 (recognizing that the Ninth Circuit has "concluded that in cases involving ongoing narcotics businesses, lapses of several months -- and up to two years in certain circumstances -- are not

sufficient to render the information in an affidavit too stale to support probable cause") (citing cases). Rather, probable cause can still exist where "'a continuing pattern or other good reasons' suggest that the evidence sought remains in the location to be searched." *United States v. Grant*, 682 F.3d 827, 835 (9th Cir. 2012) (quoting *United States v. Lacy*, 119 F.3d 742, 746 (9th Cir. 1997)). "Another important factor is the ongoing nature of a crime [which] might lead to the maintenance of tools of the trade." *Dozier*, 844 F.2d at 707 (citation omitted). Ultimately, the inquiry remains whether there is a sufficient basis to believe that "the items to be seized are still on the premises." *Angulo-Lopez*, 791 F.2d at 1399.

Here, the Affidavit established "a continuing pattern" (drugs in mannequin heads), a crime of an "ongoing nature" ("four to eight pounds [of methamphetamine] smuggled per month"), and a search for "tools of the trade" (*e.g.*, travel documents, records, cash, airbills and "other papers relating to the distribution of controlled substances"). Gov't Ex. 4 at 18. Agent Wong described his extensive experience investigating methamphetamine trafficking and his knowledge that such records, documents, and associated paraphernalia ("for using, packaging, processing, weighing, and distributing controlled substances," *id*. ¶ 2) are often maintained, stored, and/or hidden in traffickers' residences and vehicles. *Id.* ¶¶ 4, 5. And the search warrant specifically sought such documentary

evidence, but not drugs themselves.  *See Dozier*, 844 F.2d at 707 ("The

documentary records sought are the type of records typically found to be

maintained over long periods of time.") (citation omitted); *Williams*, 897 F.2d at

1039 (upholding search warrant against staleness challenge, reasoning in part that

"the operation of the alleged drug ring was such that telephone, business,

financial, and other records were likely to be kept which would link [defendant] to

the conspiracy [and] [t]hese records . . . are likely to be present for some time");

*Santistevan v. City of Colorado Springs*, 983 F. Supp. 2d 1295, 1315 (D. Colo.

2013) (rejecting argument that intervening arrest of suspect rendered information

stale, reasoning that "records [of drug transactions] were included among the items

sought in the warrant and were not likely to disappear upon his incarceration," and

"[i]n that sense, [the suspect's] incarceration would not have undermined probable

cause for the search").  In short, the information in the Affidavit was not stale -- it

provided an adequate basis to believe that "the items to be seized [were] still on

the premises."  *Angulo-Lopez*, 791 F.2d at 1399.

Although the Crime Stopper's tip sheet *alone* is entitled to little

weight, probable cause exists under the *totality* of the circumstances (where

independent evidence corroborates statements in the tip sheet, and where the tip

sheet independently corroborates other information), and considering *all* the

evidence referred to in Agent Wong's July 28, 2014 Affidavit. *See Gates*, 462

U.S. at 238 (reaffirming "the totality-of-the-circumstances analysis that

traditionally has informed probable cause determinations. . . . The task of the

issuing magistrate is simply to make a practical, common-sense decision whether,

given all the circumstances set forth in the affidavit before him, including the

'veracity' and 'basis of knowledge' of persons supplying hearsay information,

there is a fair probability that contraband or evidence of a crime will be found in a

particular place.").

**B.    Even If Probable Cause Did Not Exist, the Good Faith Exception
       Applies**

In the alternative, even assuming the Affidavit lacked a substantial

basis to support the warrant, suppression still would not be justified because Agent

Wong -- at minimum -- had a good faith basis to rely on the warrant. *See, e.g.*,

*United States v. Needham*, 718 F.3d 1190, 1194 (9th Cir. 2013) ("Even if a

warrant is unsupported by probable cause . . . suppression of the evidence found in

a search pursuant to that warrant is not justified if 'the officers' reliance on the

magistrate's determination of probable cause was objectively reasonable[.]'")

(quoting *United States v. Leon*, 468 U.S. 897, 926 (1984)). "Evidence seized

pursuant to a facially valid search warrant which later is held to be invalid may

nevertheless be admissible if officers conducting the search acted in good faith and in reasonable reliance on the warrant." *United States v. Kow*, 58 F.3d 423, 428 (9th Cir. 1995) (citing *Leon*, 468 U.S. at 926). And although phrased in terms of "good faith," the "'inquiry is confined to the objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal' in light of 'all of the circumstances.'" *Herring v. United States*, 555 U.S. 135, 145 (2009) (quoting *Leon*, 468 U.S. at 922 n.23).

*United States v. Crews*, 502 F.3d 1130 (9th Cir. 2007), sets forth factors to analyze this good faith exception:

> [t]here are four circumstances in which the good faith exception does not apply because reliance is *per se* unreasonable: (i) where an affiant misleads the issuing magistrate or judge by making a false statement or recklessly disregarding the truth in making a statement; (ii) where the magistrate or judge wholly abandons her judicial role in approving the warrant, acting only as a "rubber stamp" to the warrant application rather than as a neutral and detached official; (iii) where the warrant is facially deficient in detail as to the place to be searched or the things to be found that the officers could not reasonably presume it to be valid; or (iv) where the affidavit upon which the warrant is based is so lacking in indicia of probable cause that no reasonable officer could rely upon it in good faith.

*Id.* at 1136.  The government bears the burden of proving that officers relied on the search warrant in an objectively reasonable manner.  *Id*.  None of these four circumstances applies in this case to prevent applying the good faith exception.

First, nothing indicates Agent Wong misled Magistrate Judge Kurren by making a false statement or recklessly disregarding the truth in making any statement in the Affidavit.  As set forth in detail above, the Affidavit described the exact sources of information regarding Bernal and the 1858 Waimano Street location.  The Affidavit set forth the precise information in the Crime Stoppers tip -- including that it was anonymous, and that it referred to "Manuel Barnald" (not "Bernal") and 1836 Waimano Home Road (not 1858).  It explained the basis for concluding that the reference to "Barnald" actually referred to "Bernal," and for deducing -- after subsequent corroboration, as explained in the Affidavit -- that "1836" actually referred to "1858."  The Affidavit gave the precise timeline, indicating that CD1 was arrested in May 2013 and CD2 was arrested in January 2014, and that the Crime Stoppers tip was received by Agent Wong on May 30, 2014 (even if the tip itself was not presented to Magistrate Judge Kurren).  In short, the Affidavit fully disclosed all the relevant facts.

Second, nothing indicates (and the Sabredras do not argue) that Magistrate Judge Kurren "wholly abandoned" his judicial role or acted as a

"rubber stamp" in approving the warrant. *Leon*, 468 U.S. at 914 ("[C]ourts must

. . . insist that the magistrate purport to perform his neutral and detached function

and not serve merely as a rubber stamp for the police.") (citations and internal

quotation marks omitted). Rather, the record substantiates that the July 28, 2014

Affidavit was presented to Magistrate Judge Kurren, and that it was sworn and

signed by him and by Agent Wong on that date. Gov't Ex. 4 at 19. The warrant

was duly issued, and executed later that day.

Third, the warrant was certainly not "facially deficient in detail as to

the place to be searched or the things to be found." It clearly indicated 1858

Waimano Home Road, Unit C, Pearl City, Hawaii 96782. Gov't Ex. 5 at 1. It

described the property as "a yellow two-story wooden structure with brown trim,"

with "the numbers '1858' . . . spray painted on a cinder block wall located at the

intersection of the access road and Waimano Home Road." *Id*. It described the

different units:

> Two opposing car ports adjoin the two-story structure
> that contains units B and C. The door to unit C is on the
> bottom floor located south (left) of unit B. The letter
> "C" is posted on a white door and a black security door
> in front. The door faces east towards Waimano Home
> Road.

*Id.* As set forth above, it also contains a precise list of seven types of items to be searched-for and seized (*e.g.*, documents, books, travel records, cash, currency, cellular phones, and other items "relating to the distribution of controlled substances"). *Id*. at 3.

And finally, the Affidavit was not "so lacking in indicia of probable cause that no reasonable officer could rely upon it in good faith." *Crews*, 502 F.3d at 1136. "[F]or the good faith exception to apply, the officer's affidavit must establish at least a colorable argument for probable cause." *United States v. Luong*, 470 F.3d 898, 903 (9th Cir. 2006) (citing *Leon*, 468 U.S. at 923). A colorable argument for probable cause exists where the affidavit "is 'sufficient to create disagreement among thoughtful and competent judges as to the existence of probable cause.'" *Id*. (quoting *Leon*, 468 U.S. at 926). A court may find a lack of a colorable argument for probable cause where the affidavit is "bare bones," or "the magistrate's probable-cause determination reflected an improper analysis of the totality of the circumstances, or because the form of the warrant was improper in some respect." *Leon*, 468 U.S. at 915 (citations omitted).

Here, there is certainly a "colorable argument" for probable cause. Even assuming a different judge might consider the Crime Stopper's tip as lacking sufficient indicia of reliability, there is at least room for "disagreement among

thoughtful and competent judges." *Luong*, 470 F.3d at 903. And here, the

Affidavit described in detail an ongoing investigation into continuing drug

activity, with a common modus operandi of smuggling methamphetamine in

mannequin or "doll" heads. It linked 1858 Waimano Home Road, Unit C, Pearl

City, Hawaii and its resident (Bernal) to drug activity and to Bernal's cell phone

number -- as confirmed or corroborated by CD1 and CD2, and the Crime Stoppers

anonymous tip (which specifically indicated that "some four to eight pounds" of

methamphetamine "are smuggled per month," and that "a gun, drugs and money

are within a safe in a closet" at the premises). Even if Bernal had recently been

deported, it was certainly reasonable for Agent Wong to rely on Magistrate Judge

Kurren's issuance of the warrant to search, at minimum, for *documents* and other

physical evidence located in a safe at the premises. By no means was it a "bare

bones" affidavit.

Further, for reasons analyzed above, the Sabedras' argument that the

information in the Affidavit was stale or lacked any indicia of *when* drug activity

might have taken place provides no reason to reject the good faith exception. At

minimum, there is clear evidence of drug activity at some relatively recent time,

and connected with 1858 Waimano Home Road, leading to a clear inference that

records would still be found there.  *See, e.g.*, *Fernandez*, 388 F.3d at 1254; *Dozier*,

844 F.2d at 707; *Williams*, 897 F.2d at 1039.

It is significant for this good faith inquiry that Agent Wong did not

attempt to obtain a search warrant immediately after receiving, and based only

upon, the anonymous Crime Stoppers tip.  Instead, he spent a month corroborating

the tip's reliability by interviewing CD1 and CD2, confirming that Bernal's

residence was 1858 Waimano Home Road, Unit C, observing the location, and

waiting to confirm his cell phone number.  Any delay in seeking a warrant did not

render the information stale -- to the contrary, it indicates that the Affidavit was

the product of work over an extended period of time into an ongoing criminal

activity.  The Affidavit was not created in haste.  In those respects, the objective

circumstances demonstrate a methodical approach to seeking a valid search

warrant, and indicate (considering all the information in the Affidavit) that, at

minimum, Agent Wong had a good faith basis for relying on the warrant.

## IV.  <u>CONCLUSION</u>

After careful review of the Affidavit, and considering the applicable

legal standards, the court finds that the July 28, 2014 search warrant of 1858

Waimano Home Road, Unit C, Pearl City, Hawaii  96782, was supported by

probable cause.  But even if not, the court also finds and concludes that the

government has established that Agent Wong had a good faith basis for reliance on the search warrant such that evidence need not be suppressed. *See Leon*, 468 U.S. at 926. Accordingly, Defendant Gabriel Sabedra's Motion to Suppress is DENIED. Doc. No. 44. It follows that Defendant Estaban Sabredra's Motion for Joinder is also DENIED. Doc. No. 49.

     IT IS SO ORDERED.

     DATED: Honolulu, Hawaii, March 4, 2015.



     /s/ J. Michael Seabright
     J. Michael Seabright
     United States District Judge

*United States v. Sabedra*, Cr. No. 14-00721 JMS, Order Denying (1) Defendant Gabriel Sabedra's Motion to Suppress, and (2) Defendant Esteban Sabedra's Substantive Joinder, Doc. Nos. 44, 49